And we'll turn to the next case on our calendar, IAN v. Farfetch. Ms. Ormsby. Good afternoon, Your Honors. Lauren Ormsby from Bernstein-Litowitz on behalf of plaintiffs. On de novo review of the securities fraud complaint, this court should reverse the dismissal of both the Exchange Act and Securities Act claims. Starting with the Exchange Act, it was reversible error for the district court to address only the IPO statements and not even acknowledge, let alone assess, the affirmative misrepresentations made surrounding and starting the day after the IPO through June 2019. Those are statements and allegations concerning over 300 days of a 322-day class period. And not only were those statements materially misleading to a reasonable investor, but those statements and allegations from the post-IPO timeframe provide critical, scienter allegations that the district court was required to have viewed holistically and without superimposing its own benign reading of the fraud. And that's reinforced most recently by this court's decisions in Haines-Celestial and Textron last year. There's three narrow buckets of misstatements throughout the class period that are involved in this appeal. First, statements concerning FARFETCH's existing first-party business. And those statements include statements that we do not buy any products. We are not a retailer. We don't own the inventory. And over 95% of our revenue comes from the marketplace. The second bucket of statements are related. And those are the statements that the company had no even preliminary plans for acquisitions. And that later in the class period, the company's statements that their first-party business was reducing and will continue to reduce. And the third bucket of statements are that FARFETCH engaged in only periodic promotions and sales, as opposed to the constant promotions initiated pre-IPO to drum up sales. And that was a fact that was purposely hidden from investors. So the court's decision... Why is that latter action particularly relevant? The periodic promotions statements? Because FARFETCH, first of all, makes its money from commissions. So you have the products that are sold, and they advertise as taking 30% of those. These promotions that we allege with credible allegations of a former employee started before the IPO. So this is a current present misstatement. Those promotions of 20%, 30% or dollar value, those were taken out from their commissions. So these impacted their revenue, but they did not tell investors that they were doing this onslaught of current promotions to drum up sales. And then in their financial statements devised a kind of a KPI, key performance indicator, where they mixed promotional costs with their fulfillment revenues, so all the money they got from shipping. So there's no way for investors to do their homework and try to figure out how much of these, you know, are there constant promotions as opposed to periodic? And if there are, how are they really impacting the company's sales and how they're doing, how vibrant this marketplace really is? How do we deal with, with respect to that cluster of alleged misrepresentations, how do we deal with the fact that right at the beginning of the offering document, when it defines the terms it's using and it defines this key indicator, it makes it clear that that's not included. That the promotions are accounted for in this other bucket, and I mean, that's sort of there on the table from the outset. I understand your point that it doesn't tell us the amount of that. Right, I think investors. Weren't they transparent from the get-go that that's what they were doing? I don't think it was clear from the get-go at all. I think, first of all, the fact that they said we might increase promotions in the future was false and not consistent with their statement that they were periodic at the present. But also telling investors, okay, we're not going to tell you what our promotions are impacting our commissions. We're going to mix them with this other bucket. Fine, they told investors that, but investors can't actually deduce what that means, right, because you have positive shipping dollars negating some of those costs of promotions. If they had just said, here's the cost of our promotions, and people could tell, oh, they're losing $20 million a quarter through these promotions, that's a fact that would have informed investors. But the way they reported them, and they did have, it wasn't just shipping, but all their fulfillment costs, it was still a net positive. So it was hard, they were still, you know, that number, the combined fulfillment and periodic or the constant promotions was a positive because they did, you know, not outweigh each other. So it really left investors in the dark, respectfully. As to the statements in the first bucket where you point to statements by management that they are a platform and not a first-party retailer, those were all made, as I understand it, well after their acquisition of Browns, which is a first-party retailer. So they had both, you know, Browns is an online and actual store, but it seems to me that that was well-known and was, you know, part of the profile presented to the public. So the broad statements that we're a platform, we're a third-party retailer, were, you know, can only be understood in that context as not being literally true. I'm glad you brought that up, Your Honor, because the Browns acquisition, we actually allege, was, you know, used to actually mislead investors. The Browns acquisition was in 2015, so long before the IPO, for $10 million. It was a small boutique store in London. The Bugard's acquisition was, you know, 70 times that for $700 million. And defendants, we have everyone who told us from direct conversations, tried to downplay Browns, but they also told investors, oh, Browns was a surgical tool. We're just using this as a way to test out the marketplace, but our marketplace is first-party. And also, when they make those statements, we are not a retailer, we don't buy inventory, the fact that they had a small acquisition of Browns and that they tried to detract from investors any knowledge that Browns was anything more than an aberration from their core business model of having a marketplace. Investors aren't required to go back and do all of their homework. Nonetheless, doesn't it demonstrate still those were not statements that are meant to be absolute and categorical descriptions of what they are doing? Because they clearly were not.  One, I think at the very least they're misleading because they're giving the representation and the indication to investors that they're moving forward just as a marketplace. If you say we are not a retailer, we don't buy product, even if an investor, a savvy investor, says, oh, wait, they do have a small part of that, it indicates to investors, but going forward, that's not their goal. Going forward, they're focused on being a marketplace, where at the same time they're saying these statements, they're in due diligence to buy New Guards. They're fully in due diligence to buy the $700 million first-party retailer. The other part of that is, as Judge Broderick recently found in the Goldman 1 MBD, you can't have, you know, do we have a world where you get to make actually ridiculously, as our colleagues stated in their briefs, false statements as long as investors do their homework, right, and look back and test if they're really false. It's not a homework exam. If you say we don't own inventory, if you're saying that as late as April 2019, we don't buy products, is a reasonable investor honestly supposed to have to go back and do their homework or look at the securities law? The homework is really not so onerous. I mean, yes, the offering documents are voluminous, but with regard to future plans and forward-looking representations and so on, you know, we have a few paragraphs, and they clearly reserve the right to make acquisitions of different kinds, and, you know, we already have a variegated portfolio, kind of a business model, so it's not really clear to me that it's such an onerous obligation to hold investors to looking at the materials they're provided. I don't know how onerous it is, Your Honor, but I think a reasonable investor impacted the total mix of information because there's a misleading nature to the fact if you are hammering home to investors that you are a marketplace, that is your future, you have no plans to increase any first-party sales, and then make these blatantly false statements without any cautionary language, it's misleading to an investor about your future plans at the very least. Do you think they had to disclose that there were specific considerations or targets under consideration for acquisition? I don't think they had to disclose that they were in due diligence and had a specific target for acquisition, but it's not an omissions case. They're telling investors we don't have any plans for acquisitions, and later in February they're telling investors first party is going down to 5%. You don't make these actual affirmative misrepresentations of where the company is going when your actual plans are the opposite. But what is the timeframe that it's appropriate to look at? I mean, this seems to me still consistent with the notion that in the long run, and some of those allegations, the statements that you pointed to said in the long term, we're going to look at first party being 5%, 10%, what have you. So the fact that that didn't happen right away in 2018, 2019, that doesn't necessarily render those statements false, does it? I think it does, Your Honor. I think at the very least, especially when we know concretely that the due diligence, it wasn't talks, it wasn't thoughts, it was actual plans for the acquisition to spend all of their IPO proceeds on a first party retailer. Defendants perhaps did not have to say, hey, we're going to go acquire new guards and use all of our IPO proceeds. It was $675 of a billion, right? $675 million. It was a billion dollar offering, but what the company got out of that after underwriters fees and all of that was closer to $675 million. But they were required not to make affirmative misrepresentations about where the company was going when they knew the opposite. If we can go, oh actually, I reserve time. Thank you, Your Honor. We'll make sure we'll give that extra time as well. Good afternoon, Your Honors, and may it please the Court. Farfetch made no false statements in the offering materials or afterwards and it certainly didn't do so with Sienter. Judge Nathan rightly dismissed the complaint here. Plaintiff's Court claim, as we just heard, is that Farfetch told investors it was running an exclusively third party business at the same time that it was actually radically shifting strategy to a first party strategy. But the record materials make clear that there was no such change to the core strategy. Both before and after the IPO and before and after the new guards transaction, Farfetch revenues continued to predominantly come from third party sales. Even though the company acknowledged throughout the entire process and was transparent that first party retail was important, even though it was smaller than the third party sales, it was still an important part of the strategy. Farfetch was transparent with investors about the role of the first party business at all relevant times. But still, I was just struck by the size of the acquisition of new guards. I mean, Browns was small. It was $10 million. And new guards, we're talking $675 million, almost of all of the proceeds that came to Farfetch from the IPO. And that was really at odds with their general descriptions, repeated descriptions about the nature of their business, and even acknowledging that there's a short-term, long-term discrepancy potentially. But, you know, why was it okay not to disclose more prominently that it would be important for the third party business to make some first party acquisitions potentially or just to give some clear signal to investors that they might get into a situation where they'd be taking risks involving inventory and so on that some investors in the market have not recognized they were taking? Right. So a couple of points on that, Your Honor. First of all, with respect to the new guards acquisition, I think it's important to keep in mind the timeline. The allegation is made that the due diligence on new guards began, I think it was in February of 2019. And the bulk of the statements that are at issue here are in the offering materials. There's conspicuously no assertion, no allegation, that new guards specifically was on the table at the time of the IPO. And I think it's especially conspicuous the absence of that allegation, given that the other side has someone that they say was an insider in the company who actually ended up working on the new guards acquisition. And even that person didn't say new guards specifically was under consideration. But I think there were statements also in May of 2019, right before the August acquisition of new guards, just public statements, I don't know whether it was an earnings call kind of situation or to the media that, no, you know, our business is, we're a platform. Right. We're not inventory banks. And I think the company was talking about its general strategy, and that was still true even after the new guards acquisition. Although it's true that buying new guards for a substantial sum of money, it was not all the cash. It was part cash, part stock. But either way, it was a big purchase. But the understanding and the explanation was that that was still going to, in the reality, after the new guards transaction happened, you can see this on pages 935 and 937 of the joint appendix, even after new guards was purchased, predominantly the revenues still were third-party revenues. And that was certainly still the third-party strategy was still the company's long-term plan, even with the new guards transaction. I think the company actually made clear in a couple different places that it was considering first-party acquisitions that were kind of like this. In fact, in the offering materials themselves, the company identified Browns, the Browns purchase, which at that point, as the other side makes clear in its complaint, was representing somewhere, depending on how you count it, somewhere, you know, a significant portion of their overall profits was being generated from Browns. The offering materials identify Browns as an example of a possible acquisition that would be on the table. So they specifically sort of highlighted that. It was then an earnings call in February 2019, when the company's executives were talking about the role of the first-party retail in their overall strategy. And the statement was made that the first-party retail component was absolutely strategic, absolutely strategic. That's the phrase that was used. And it made clear that it was absolutely strategic because it was part of an overall strategy where making from time to time acquisitions in this space would generate a halo effect around certain products and would be used to drive consumers to go to the website and purchase from the platform. It was entirely consistent with the overarching third-party strategy to have a small but substantial first-party retail component to that. And when the opportunity came up to purchase Newgard, it was perfectly consistent with what the company had said in the offering materials when it reserved to itself the broad discretion, that's the phrase used in the offering materials, to make these kinds of acquisitions that were first-party, just like Browns, and that's what it did. I also think- Sorry, I want to come back to this February 2019, because you emphasized the statements in the offering and were saying that those predominated in the allegations. I think there were a number of allegations very much at the time, the allegation anyway is that the Newgard due diligence was well underway. So in February 2019, they emphasize in response to a specific question about this, it's only 8% of the offer, it's in the single digits, which by the way was 20% at that time, counting the first-party platform, and long-term it will be single digits. That certainly suggests a trajectory away from the first-party realm at the very time when they're in due diligence on this acquisition. Well, I think respectfully, Your Honor, I think what the company was saying, both in the offering materials and in that answer, which is the same answer where they say that first-party retail has an absolutely strategic role to play in our overarching strategy, is that, look, we've got this big-picture strategy, mainly it's third-party, but there are going to be targeted ways in which, whether it's Browns or, as it turned out later, Newgards, where acquisitions may be made that are going to be complementary to that third-party strategy. Plaintiffs are saying that this was like a shift from the strategy, and they say on page 34 in the brief that the company had promised that all growth would be exclusively third-party, but that's just not true. That promise was never made, and that's, I think, the core of their argument here. Again, we cited Browns as an example of future potential acquisitions, and I think the general statements that you point to in that answer, coupled with the statements in that answer about why first-party is still absolutely strategic to the business, I think they lend context and explain why the company would consider acquisitions like Newgards. You know, that February statement was made, you know, a number of months before the Newgards transaction actually happened. It's true that due diligence started around that time, but nothing was definite yet, and it was perfectly within the company's, you know, the company was being very straightforward in sort of explaining its overarching strategy, the two components of it, and the balance. And I think one thing that's also important to make clear is that the company wasn't just saying words to talk about these strategies. The company was also putting down on paper real numbers to show the balance between first-party and third-party. I think the best example of this in the offering materials is the chart here on page 512 of the JA, where the company not only talked about the Browns sales, both the in-store sales and the online sales, but actually highlighted them in these red boxes so that investors would be able to see graphically and with the numbers, you know, what the proportion of sales would be. And then it went on to make similar statements talking about the balance of first-party and third-party in all of its securities filings throughout the class period. That's at pages 825, 840, and 1022 of the joint appendix. So I think throughout this period what you see is a strategy that's multifaceted. It's not just only third-party or only first-party. You see the company trying to be transparent about the overarching strategy, the company disclosing the exact balance of third-party and first-party within that strategy, and I think that on the whole they're being straightforward. There aren't any false statements. What about the statements? Sorry to interrupt, but in the roadshow and in interviews around the time, they were saying that the company would have no inventory and would be only a platform for retailers. No inventory, and then, you know, they spend three-quarters of a billion dollars buying a company with inventory. So I think a couple things on that. First of all, the roadshow statements are not part of the class period, so they're not part of the case just as an important technical matter. I think with respect to those no inventory, the no inventory statement, I think that statement can't be understood in isolation, and it shouldn't be understood literally either, but those are two different points. It can't be understood in isolation because if you look at the full statement, the full statement is talking about FARFETCH's distributed inventory model, and then in the context of talking about that model, it says no inventory. The distributed inventory model is essentially the third-party portion of its strategy. I think that statement is best understood as really referring to the FARFETCH marketplace where it's, you know, the whole third-party strategy component of its overall operations. I don't think it was trying to say, and it would have been completely ridiculous, as we said in our brief, for the company to be saying that we don't have any inventory one day after they filed offering materials that highlighted in these big red boxes that there was all sorts of first-party sales that were going on. So it can't be taken in isolation. It can't be taken literally either. Well, now that you mention this, Mr. Martinez, I know that cases like this, of course, are generally or often decided on 12B6, but your very different perspective on these matters in response to my colleague's questions raises a simple procedural question. Why aren't these issues properly subject to discovery or examination of relevant persons? It's always been a mystery to me how these financial cases are resolved on 12B6, and I'm just wondering whether this is not—isn't this a case where everyone would benefit or the record would benefit from discovery and depositions of relevant persons? I don't think so, Your Honor. I think this is like a lot of the securities cases that you all see, and I think what this Court and what the Supreme Court and other courts have done is when assessing, for example, whether a statement is false, you've been willing to look at the allegations in the complaint, of course, but also to the materials that are referenced and incorporated in the complaint. Here that would be the documents such as, for example, the offering materials. But it does require the judge or the judges to make some kind of significant fact-finding decision in doing that. I don't think so, Your Honor. For example, I think the core claim here is being made that the company Farfetch was essentially hiding the first-party component of its strategy. But if you look at page 512 of the joint appendix and the other materials I've referenced, that allegation is just flatly incompatible with hiding anything because those revenues were fully disclosed. I think with respect to the allegation made on page 34 of their brief that we had somehow promised to the world that all acquisitions would be exclusively third-party, I think that assertion is just flatly belied by the record. Help me, since you've been good enough to give us very explicit citations to the record, which is always impressive but perhaps not overwhelming. Joint appendix, page 512, let's turn to it, and perhaps you can just walk me through this. Why do you think the material at JA 512 is important for us to bear in mind? Sure. So I think this doesn't answer every aspect of the case because, of course, this was a 185-page complaint with a lot of things thrown at the wall, respectfully, in our view. I think this answers, I think, the primary thrust of the argument that we were hiding the first-party retail component of the strategy. And so if you look at the chart, because I think that's the most revealing portion of this, there are three different measures, GMV, revenue, and gross profit there. And if you look at the GMV and the revenue measures, the top two sort of horizontal bars on that chart. Sorry, GMV is? Market value. The gross, sorry, the gross market, I think it's the gross marketplace value. Yeah, sorry. A lot of different acronyms floating around in this case. Plus microscopic print, we're going to need something. Well, I think that's why the colors are so helpful, Your Honor. I'm not suggesting it's deliberate. No, I mean the colors are helpful here. So GMV, it's essentially the value of- We don't have colors. We didn't give you the colors. Well, that's our fault, Your Honor. We'll happily submit this one page if it would be helpful. If you would. Yeah. And also magnified so that persons of advanced years can actually read the data provided under group and browns, et cetera. But, sorry, you'll do that. Yeah, we can do that. And I think just there, basically I'll just describe it to you. We have boxes that are colored. The red boxes that appear in the horizontal lines specifically break out and allow you to see graphically with the numbers attached to them, the percentage of the absolute numbers and the percentage of revenues that are attributable to the first party. You know, at that point it was just browns, the component. So I think someone who reads this would know that browns was there. Sorry, so it says fulfillment and then first- Yeah, fulfillment. The box to the right of fulfillment is the browns sales that were on the platform. And in the box all the way to the right, which under the word browns, those are the browns in-store sales. So the browns online is between fulfillment and third party. Exactly. And this will be a lot clearer with the colors. Sorry about that. I think you don't even need the colors, though, Your Honor, because the browns component of the business is talked about. It's not hidden at all. It's talked about, I think, 70-plus times throughout the offering materials. I mean, this was not a secret that browns was part of the business. And I think the most notable place in which browns comes up in the offering materials, as relevant to this case, is in the portion where the company is talking about how they might use the proceeds of the IPO. And the company says, we're going to consider possible acquisitions. It says that these acquisitions might complement and expand the brand and products that we're going to offer. And then it says, you know, one example of a possible acquisition that we might consider is what we did with browns, which at that point was generating a significant portion of the company's revenue. This is on 503. And it says create public market for a class A shares. And this includes possible acquisitions. But then it says we do not currently have any definitive or preliminary plans. Right. And they didn't have any definitive plans in mind. The New Guards allegation has been made. But at the time that these offering materials were issued, there's not an allegation that New Guards was under contemplation. Even though they've talked to, apparently, an individual at the company who says he was on the New Guards acquisition when it ended up happening, even that person doesn't seem to allege that New Guards was known at the time that the IPO was, you know, and these offering materials were put forward. Your Honor, if I could just say one last thing. I do think we've talked a lot about the falsity issues. We also don't think there's no scienter. I won't get into the details of that, but we think Judge Nathan got that exactly right as well. The issue that Judge Nathan did not reach in this case had to do with the Securities Act. We have several independent arguments on the Securities Act. I won't run through them, but I do want to flag, we do think there's a very substantial argument that there's no statutory standing under Section 11 because they haven't satisfied the traceability requirement, and under Section 12A2 because they haven't satisfied the immediate seller requirement. We think those are fully valid grounds that have been fully preserved and fully briefed for getting rid of the Securities Act. So those were presented to the district court, but she chose not to address them. Right, because we had other victorious arguments on falsity. Thank you. Thank you, Your Honor. Ms. Armsby, before you get into the specifics of your responses, what about this question of discovery? Can you give us an enlightenment on how a case like this evolves? Absolutely, Your Honor. First of all, with discovery, with New Guards, we believe for at least four reasons, which the district court itself acknowledged that the New Guards acquisition was very likely in play or at least in talks at the time of the acquisition. We don't have hard facts of that, but we know they were amping up their acquisitions team. We know that New Guards was an existing customer. We know that New Guards, that the acquisition of stadium goods started the day after the IPO, so frankly, any attempt for the defendants to say that the statement that there was no preliminary plans for acquisition is suspicious at best. But I think those are the kind of things, discovery. But if I could turn, I think also, you know, my colleagues here say a lot that there's no reasonable investor could have ever believed that there was not going to be this type of New Guards acquisition or growth. And if you look at the epitome of the reasonable investor, courts often look to analysts, and analysts certainly were stymied by these representations. At the beginning of the class period, they said there was great possibilities for Farfetch because they never take control of the product itself because Farfetch owns no inventory. But wait, these secondary commentators, though, aren't commenting on what is in the offering materials, are they? The preliminary prospectus was out at the time those statements were making. Yes, but they're responding to, I mean, they're discussing what is the company's business model at a really fairly high level. I mean, these are brief accounts, not heavily analytical accounts, and they don't go through and look at what is actually presented in the offering materials, do they? I do believe that Luca Silca, who is one of the analysts for business and fashion looked very intensely at this company from its start through the end, and other analysts from Forbes and analysts. And in August 2019, when the stock dropped 40. How do we know that from the record, what you're telling us? I think we allege that Luca Silca, among a couple of others, wrote many articles about the company from its inception, looked at how it compared to retailer YNAC. So this appears in the record how, as matters referred to in the complaint? Yes, and we have a whole... Incorporated in the complaint? Incorporated in the complaint, and actually for some of these, defendants did ask the court to take judicial notice of them. Otherwise, they're in the complaint and can be incorporated. And when the New Guard's acquisition was disclosed, among the other disclosures on August 8th, analysts said that this acquisition runs counter to the company's core. It added lots of non-marketplace complexity, and Mr. Silca said that the acquisition was a change in the business model. So, you know, I think defendants go too far by saying we allege that they promised they'd never... But what time frame should we look at? I mean, the fact that there was a...this happens regularly, right? That there's an announcement of some kind, stock price drops, and then it recovers. Things happen, we reassess, the context is provided, what have you. And, you know, the district court wrote that the stock price had recovered. It was rebounding by several months later, I think January 2020. And, you know, I don't know what's happening with the company right now, but it's not inconsistent with their statements that their long-term plans were to remain a platform and to have the first-party retailer just be a subsidiary part of their business, but an essential part of the third-party business. So it seems to me that having, you know, press reports like that doesn't really prove a lot. I think, well, to give a short answer, the stock is trading at $5 now. There was a big bubble, especially during COVID, when a lot of online retailers did quite well. But right now the stock is facing, and it's not in the record, but inventory problems and problems with its marketplace that have caused the stock to plummet increasingly over the past several months. But I think what the problem here is sometimes they're in a pure omissions case. What did they have to disclose? You don't have to disclose you're going to change your business model. This isn't a pure omissions case. This is a misstatements case where they made affirmatively false statements about their plans, their current existing and active plans. And that's a different way to look at things than a pure omissions. And you can look at JNCO Solar, or you can look at, you know, a lot of other. There's tons of cases like Lorelei. But when you have an affirmative misstatement, you have to tell the truth. And that's just a common core of all of the securities laws that we follow. And it's easy to confuse that with omissions when, you know, and I think the district court respectfully put that imprimatur on these statements that it didn't really deserve. Could you take a moment to address the standing argument, please, and the traceability requirement? Absolutely. At the very least, I think if there is any there there, it should be remanded to the district court. But there's one registration statement here. And the shares, all the shares that were issued were traceable to that. Defendants cite two cases in their standing argument before you, Ariad and Century Aluminum. Those are cases where you have two registration statements, a primary initial offering and a secondary offering. And as many courts, almost all courts have found, when you have a second registration statement with new different statements, the plaintiff has to trace their shares to that second statement. We have one registration statement here. Those statements were live throughout the class period. And they haven't cited any case where just because some of the shares that were issued and discussed in the registration statement that went to officers and directors of the company and other early investors were freed up and entered the marketplace that that defeats tracing here. It's simply not in the record. It wasn't before the district court. And the case that we've cited, which is Perry v. Dwayne Young, Judge Daniels, a few years ago, 2013, but he found in similar circumstances, that especially at the pleading stage, that does not in any way defeat plaintiff's ability to bring this case forward on either Section 11 or 12HU standing, that what we've pled is adequate. Thank you. If I have time for a couple more points. Very quickly. Okay. I know it's late. Just going to the February 2019 statement that my colleague mentioned a couple of times from the conference call where they mentioned that first-party sales can be a surgical tool. And that's what they said. He was saying that language, that surgical tool language was left out of the discussion. That's precisely what they advertised Browns to be. We're not saying they didn't tell people that Browns, but this was a tool to kind of gauge the marketplace and they can use it in a creative way. A $675 acquisition of Nugard's was an organ transplant. It was a hacksaw. It's not a surgical tool. This was a sea change in their model and plan. So I think to us that February 2019 statement is false because it's characterizing and mischaracterizing what first-party sales meant to the company then and what they were going to mean in a very short time period as defendants knew. I think Scientra really does follow from a lot of these statements and the most compelling thing we could just say is the district court limited her Scientra analysis to two cautionary statements on one day, which is the IPO, and did not address either in her factual summary or in the discussion of the fraud any of these compelling allegations of Scientra and respectfully we do believe that was a reversible error and they should have been viewed holistically with the very compelling motive allegations that we won't go into now, but they're in our brief. On the question of the IPO, I understand your position to be that the company had a duty to disclose data on promotional incentives in the IPO offering documents. Is that right? That's correct. They had a duty to not say that they were periodic and to disclose the impact of those promotions. Do we have any authority in our circuit for holding that a company has a duty to disclose data on promotional incentives in an IPO offering document? I don't have a case that says that, but we also, I have not seen any scenario put forward where they made an affirmative statement about those promotions, which is what they did here. Is it your contention that they had a duty to make those disclosures in the abstract or is it because they were including the total revenue figure on their marketplace platform, money that was actually being discounted off, that that created the misleading state of affairs that required the disclosure? Yes, Your Honor. I think they had a duty to be honest about the impact and the need to have promotions because that certainly was a driver in August when they disclosed extreme promotional activity. It was a huge hit to the company and analysts remarked on it, but I think the KPI as it was, was misleading and it was misleading both because you couldn't determine the promotional rate and because it made their take rate, which was a key marker that they advertised their commissions, misleading. Because as FE1 and others, you know, those allegations are in the complaint that the take rate wasn't 30%. When there was a 30% sale, it was $0 because they had to pay the sailor back for that sale. Thanks, Your Honor. Thank you, Your Honor. We have you. Let me suggest the utility of following up with Mr. Martinez regarding that page in color and magnified lettering. And if we could take advantage of that, that would be by next Monday, five o'clock. And then perhaps you could give us the benefit of your research in the interim as to whether we have circuit precedent on the question of a duty to disclose data on promotional incentives in IPO documents. Would Mr. Martinez have an opportunity to respond to whatever authority? I'm a very generous person. Yes, even that. Thank you, Your Honor. Yes, of course, of course. Absolutely. Each of you will have an opportunity. And you will have an opportunity, of course, in the nature of things to give us regarding whatever he sends us. Right. And I will also note on that same page, 512, that chart is, you know, a pictorial chart. But above that, the company does disclose the dollar value of the brown sales. And we don't allege otherwise. There is one part where they say at the time of the IPO, the revenues. But that's not the point, and that's not the core of our allegations about what they were misleading us. So each of you will have an opportunity to comment on the filings of the other by the following Wednesday, which is to say a week from today. Thank you both very much for a well-argued case. Thank you, Your Honor. Thank you. All right. We'll turn to the last case on the day calendar, which is J.S. v. New York State Department of Corrections and Community Supervision. Ms. Keegan. Thanks for your patience. You held out. We're happy to see you. My pleasure, Your Honor. Thank you so much for the opportunity. Good afternoon. My name is Julie Michaels-Keegan, and I represent J.S. in this matter. May it please the Court. At the time that J.S. filed the underlying hearing to establish his right to a free, appropriate public education, he was an adult with legal capacity. There was no dispute that he had a right to a hearing. There was no dispute that he is a prevailing party. And therefore, there really can be no basis to find that he is not entitled to attorney's fees. To reach the opposite conclusion, that adult students with legal capacity may not benefit from the IDEA's fee-shifting provision, flies in the face of the purpose of the IDEA, which is to enable students to receive a free, appropriate public education. Can I ask a question? You're referring to him as adult students, and I think that term creates some confusion. Under the IDEA, they're children. Is that right? But under state law, they're adults with capacity. There's this three-year window in which somebody is a legal adult under state law, but under the IDEA, they're a child with disabilities. I agree with you that the IDEA uses the term child. I am, for the purposes of this presentation, using the word student because it's adult student because that is who J.S. was, an adult student. But his right to a free and appropriate public education was cast as one that he had as a child under the statute. Isn't that correct? The statute provides that, specifically says that parents of children with disabilities who are prevailing parties may recover attorney's fees. But what I meant is that the general, the baseline right derives from the free appropriate publication part of the IDEA, which is a FAPE, is available to all children with disabilities residing in the state between the ages of three and 21. So that's what I understood, same as Judge Robinson, that he was a child with a disability up to the age of 21 under the statute. That is correct, Your Honor. Yeah, I wasn't trying to question his maturity or something. I just, from the perspective of the statute, it's one category of people. This is not some separate category of people under the statute that's called adult students. It's part of the same category. Exactly.  Thank you. So that is why the Supreme Court very clearly said, instructed courts to read the terms parent and child interchangeably, because any other interpretation will have absurd results. Docs would have this court begin and end its inquiry with the literal meaning of the term parent, but that is not the analysis that is applied time and again by this court or the Supreme Court. The inquiry only starts with the terms of the provision. The court must then interpret the provision in light of the entire statutory scheme and Congress's intent, and also while avoiding an absurd result. J.S. is not asking this court to- Yes, Your Honor. There are two references specific to the attorney fee provision that go directly and mention students and include them along with parents in their reference to the attorney fee provision. So that's very specific there. And what I would also point out is there is nothing in any congressional history or legislative history where it shows Congress deliberately contemplated not including kids and didn't do it. So they've never even contemplated it. So they've mentioned it twice. They have never said, no, we can't let students recover fees if they're adults enforcing their own rights. How do you explain that a case like this should surface so late in the history of the IDEA statute? I mean, it seems like a more common situation. At first I thought it was unusual, my first question, but now I think maybe it's very usual. I think the case itself is uncommon because in many instances, let's face it, an 18 to 21-year-old will have a parent or someone working with them to advance their rights. But then there are individuals like J.S. who was in prison at the time. It was an adult prison serving an adult sentence, and he wanted his education. And it seems beyond belief that he would have to then reach out to a parent or have a surrogate appointed for him when he himself wanted to enforce his own rights. I didn't see you arguing the principle of constitutional avoidance, but I'm wondering what your thoughts are about that. What would be the constitutional ramifications of a statute that basically provided fee shifting for people defined as children with disabilities under the statute who are minors, people who are defined as children with disabilities who are between the ages of 18 and 21 who are collaborating with a parent or under guardianship, but not those individuals who are acting in their own stead? Yes, Your Honor. That does seem like there is an equal protection issue there, and I think it was addressed by the amici in their brief. And we would support that. But it is so clear under Winkleman, as well as the attorney fee statute itself, that adults, adult children who can have the legal capacity to enforce their own rights should be able to do so. And so it's helpful that you're talking about how clear it is because it strikes me that that's a segue into the second issue here, which is the spending clause issue. Doesn't your argument to some extent rely on the notion that the statute is ambiguous and therefore we have to invoke extra textual considerations? And if that is the analytical framework, doesn't that put us in a spending clause bind? No, and no, and no. Okay. First, I don't feel we're in a spending clause bind because the statute itself says we pay fees to prevailing parties, period. So whether JS- I'm sorry, doesn't it say to a prevailing party who is the parent of a child with a disability? Yes, Your Honor. Yes, so- To a prevailing party who is the parent of a child with a disability. And then it defines parent, and that's part of what we're talking about here because it doesn't say just biological parent. It offers different persons who have responsibilities or undertake responsibilities on their own for pursuing the rights that the statute gives. That's correct, Your Honor. It includes anybody legally responsible for the child's welfare, and clearly in this case, JS was responsible for his own welfare. No one else was. So getting back to your concern, so if a prevailing party of a student with a disability is dependent on the student's right, and so there are a fixed number of students in New York State, and if they pursue their rights, they are entitled to fees. And so I don't think it comes into any conflict with the spending clause because it is a fixed number of students. It's not really who brings their rights. Well, but it's-I mean, you could see an argument that the statute read the way that it wants to read it. It says that the universe of people who are entitled to that fee shifting is slightly smaller than the universe of people that you're advocating for. There is a component of children with disabilities who, if they're prevailing parties, don't actually get the benefit of that, and that is in particular those who aren't represented by a parent or an individual acting sort of in loco parentis. That is correct. Interestingly, in Winkleman, the Supreme Court also dealt with the spending clause. And in that case, as I'm sure you know, the Supreme Court expanded all of the rights of children, extended all of the rights to children to parents, and said that still didn't have an impact on the spending clause. It didn't add any new obligations, and it didn't add any new liabilities. There wasn't a new fee shifting provision or something that came along. I'm just wondering whether this is a step beyond that. I don't think it is a step beyond, Your Honor, because we're talking about individuals who are entitled to a free appropriate public education. And to think that New York State, when contemplating whether to ask or whether to accept funds under the IDEA, said, well, as long as those adult students can't bring a hearing and prevail on their rights, we're not going to go with the IDEA. It's kind of a- Even so, even though we might all agree that it doesn't make sense to excise this small class of students who are between 18 and 21 and pursuing their rights on their own under the statute. Can't you agree, or don't you have to agree, that just looking at the language to a prevailing party who is the parent of a child with disability, if there weren't a separate section defining parent, it's hard to find ambiguity there. We know what parents are. Then we have to look at the definition of parent. And in the ordinary course, one typically wouldn't, I don't think, refer to oneself as an individual who is legally responsible for the child's welfare where one is the child. So, I mean, it's not an obvious textual argument, even though we might all agree that the purposes of the statute would be ill-served, and there was no basis for looking-I mean, Congress gave no sign that it was trying to disadvantage this cluster of people who would qualify for a FAPE and who are between ages 18 and 21. But don't you agree that the text is not quite so clear as you're making out? I do agree with you to the extent that I think there are many instances in the IDEA where Congress was really focused on kids who were minors, because for the 15 years that you're eligible for services, birth three, age three, it's actually birth to age 18, it's parents that have to enforce your rights. You don't have the right as a minor to go into court and enforce your rights. And so I do think a lot of times those terms parents and child had that group of people in mind. But what I do know is that by expanding the definition of parent beyond its typical interpretation, that we are certainly-the gist of what they were looking for was they wanted to make sure that someone who had legal authority was acting on behalf of that student. And there is nothing in the legislative history or elsewhere that would say that they wouldn't have that authority. So your response to Judge Carney, I take it, may be that we don't have to rely on a definition of parent. Is that right? Is that your position? My position is- Or do we have to reach that question and say parents include children? I don't think you have to reach that question because I think the Supreme Court already did in Winkleman. Yes. Tell us about Winkleman. Sure. So Winkleman was based on parents who were basically claiming they had their own rights under the IDEA. And in fact, they didn't have their own legally enforceable rights. They were very limited. They were limited to procedural things such as attorney's fees. And so in Winkleman, the court said we can't limit parents' rights that way. Parents certainly have the right to a fate even through their child on behalf of their child. And so when we look at these provisions throughout, we see references to children. We see references to parents. And that the only way to reconcile the differences there was to read them interchangeably. And it wasn't just parents get all the rights that children have. It was and vice versa. Children also have the rights that parents have. And then they used the attorney fee provision itself as an indicator of the absurd result that would occur if we were not to include the term, not include children in the attorney, not interpret children as parents. As parents and vice versa. Yes. Could I clarify one thing? I mean, I thought that you were in fact relying on the statutory definition of parent, which includes the phrase an individual who is legally responsible for the child's welfare. And that that clause, as well as the rest of the definition of parent, to include an individual acting in the place of a parent and an individual, a guardian, and a foster parent, and so on, to evince an expansive intent on Congress's part that would literally read, even though it wouldn't be maybe the most natural reading, but it still could be read to include a child acting on his or her own behalf, to enforce the rights under the statute. That's exactly right, Your Honor. First and foremost, I think Winkleman gives the guidance that's needed. You need to read these terms interchangeably, and you can even do that in the attorney fee provision. Second, the attorney fee provision, by looking at the definition of parent, which we must if we're looking at what the meaning of the term is, definitely includes an individual like J.S. who was of age of legal majority and able to enforce his own rights. We have to think about the consequence also of not allowing J.S. or other adults to enforce their rights, or at least recover fees. Recovering fees allows individuals, it levels the playing field, right, for people who want to enforce their rights. This court and the Supreme Court have been very clear that any fee-shifting statute is there to ensure that people can vindicate their rights who would not otherwise afford to be able to. That's certainly the case with J.S. Thanks very much. Thank you. You have reserved some time, exactly two minutes eventually. Good afternoon, Your Honors. Kevin Hu on behalf of DOCS. So I would actually like to begin with Winkleman because I think a proper understanding of that case really helps us, would assist the court and the parties in determining where to begin this analysis. So as a threshold matter, Winkleman is not binding on this court because it was not considering a party's entitlement to attorney's fees. You're speaking of Winkleman? Winkleman, yes, Judge Kovanes. And so to the extent that it may have cited the attorney's fees provision in conducting its analysis, at most it can be persuasive. But at some point, there's such a thing as good dicta and bad dicta, right? That is true, Your Honor. And to the extent it's bad dicta, there are two contextual elements of Winkleman that really undermine that dicta's value. And so the first is the statutory interpretation posture. So in Winkleman, there was no statutory provision on point that addressed whether parents have substantive rights in the FAPE. And so that's why the court resorted to the interlocking provisions, the statutory history, and general policy concerns to sort of divine whether the statute as a whole, subsilentia would prohibit parents from asserting that substantive right. And so here, we have sort of the opposite. There is a statutory provision that expressly excludes people, adult children. Wait a minute. It doesn't expressly exclude adult children. It includes an individual who's legally responsible for the child's welfare. Is J.S. not legally responsible for his own welfare? As a practical matter, that may be true, Your Honor. But in terms of the statutory language, that would be an unreasonable interpretation of the statute. It would be unreasonable in a world where child and adult meant the same thing in the statute and the state law. But once you sort of reckon with the fact that he is an adult outside of the context of this statute, but in the statute he's a child, doesn't it make total sense that he falls within the catchall of an individual who's legally responsible for the child's welfare? Your Honor, I would respectfully suggest that both the fee-shifting provision and the statutory definition of a parent evince congressional intent that a parent and child would not be the same person. What do you point to to suggest that Congress actually considered this and excluded the children between 18 and 21 who were prosecuting their rights to have a FAPE in that three-year span when they were adults under state law but a child under federal law? Is there anything in the legislative record or any place in the statute that suggests Congress actually considered this and rejected the notion that they could recover their fees if they prevailed in asserting their rights? There is nothing in the legislative history that necessarily suggests Congress intended to exclude these individuals, but by choosing the plain language that they did. They used the word parent in 1415 I3B1, but then for the definition of parent, they have an expansive definition that includes people who are not parents. That's right, Your Honor. I agree with you that the third definition of parent, which is subsection C, includes a broad functional definition of parent. That is certainly expansive, but the key characteristic Including, I'll just point out, an individual acting in the place of a parent with whom the child lives. It could be a neighbor. That's right. It could be someone with no legal status. That's right, Your Honor, but the key characteristic is a certain type of relationship with the child. That is what brings you within the ambit of subsection C. The neighbor? Responsibility. For example, the first subsection says an individual acting in the place of a natural or adopted parent with whom the child lives. There, it's that individual's voluntary assumption of a parental role in conjunction with residence. What does that mean in the context of somebody who's a legal adult for purposes of everything but the IDEA? How would you have a parental role for somebody over 18 as a legal matter? Your Honor, that would be a sort of contextual analysis that would really depend on the relationship between the individual that claims he would satisfy that definition and the putative student. It could perhaps be shown by the degree of care in which that individual is providing for the student, or it could be It seems like you're moving, I mean, if we're trying to do a textual analysis here, it seems like what you're describing is something much more evidentiary and mushy and fact-based. Let me backtrack for a moment, Your Honor. Regardless of what would satisfy that definition, by choosing to define this category of parental individuals based on a relationship with the child, that presupposes that individual and the child will not be the same person. Does your argument imply that if a child is between 18 and 21, that they've also lost their rights to due process administrative hearings and to administratively appeal the results of hearings and to bring a suit like this? It would not, Your Honor, for two reasons. And so the first is that notwithstanding the Supreme Court's dicta in Winkleman that there should be no difference between substantive and procedural rights, there is a potential that those rights should be treated differently. Because the Supreme Court was never presented with a procedural right, a reimbursement-related right, to which special doctrines may apply. Even if Winkleman doesn't control here, there's language in Winkleman that suggests it goes in different directions, it does still reflect an approach to looking for a statute that makes sense and that wants to, that achieves the congressionally stated goals, which have been well-developed over the past 20-plus years. And I'm having difficulty understanding how it's consistent with that approach and with the broad language that Congress adopted here for the definition of parent to take as narrow and kind of cramped reading as you're proposing here. Your Honor, let me first try to answer your question in a different way, regarding the ability to seek due process hearing. So that right is fundamentally intertwined with the substantive right to a fate. And so interpreting parent in a narrow, interpreting the word parent in a narrow sense in that context would certainly lead to an absurd result. It would result in the parent- Why is that the same here? Where to vindicate the rights, he would have the same rights as his parent would have if the parent had brought the suit. I mean, that's as intimately intertwined with obtaining his rights, isn't it? As pursuing a due process administrative hearing. Your Honor, I would respectfully suggest that the right to reimbursement is only tangentially related to the substantive right, in the sense that it is undisputed that he has the power, that an adult age child has the power to initiate proceedings to challenge the denial of a fate. But the reimbursement of attorney's fees for better or worse in our legal system is a privilege. Under the American rule- But the American rule has no purchase here. I mean, Congress made the choice that attorney's fees that were incurred by parents in pursuing their child's rights were reimbursable. And it seems to me that to jump from that back to the American rule ignores the whole structure and thrust of this statute. Aren't they really in conflict? Why do we go back to the American rule in this context? Your Honor, the reason the American rule applies here is because of, quite frankly, spending clause principles. Under Arlington Central School District, the Supreme Court made clear that when a statute is expanding liability on the states, the states must have clear and unambiguous notice of the terms in which they are accepting federal funding. As Judge Robinson pointed out earlier, though, the liability, the obligations of the state are the same. The only thing that is different is whether, potentially, whether the state has to pay legal fees if it has breached its obligations. Judge Carney, I believe Judge Robinson's comment about the legal obligation being the same was regards to the substantive right that was at issue in Winkleman, which is to say that a student has a substantive right to a fate, but the expansion there was saying that a parent also has an independent right to assert that in court. So ultimately, there was no new liability because states are required to provide a fate, but it's just a question of who can vindicate that right in court. And so here, the right at issue is one of reimbursement. It's fundamentally one of financial obligations. So are you suggesting also that the state would not have signed on to participating in the IDEA had it known that for the class of adult children between 18 and 21, it might have to pay legal fees if it was shown to have breached its obligations to that small body? I'm not necessarily suggesting that the state of New York would have made a different decision, but the standard under spending clause jurisprudence is whether they had clear notice, not necessarily whether the substantive decision to participate or not would have been different. So what's the congressional interest that's furthered by a statute that awards attorneys fees to 95%, I don't know what the numbers are, of the people who pursue these claims, but not to this subset of children with disabilities who actually have the legal capacity and capability of pursuing their own claims? Judge Robinson, that outcome is not necessarily absurd because Congress could have rationally concluded that because this subset of individuals is so small, and Plaintiff actually concedes in his reply brief that the number of adult children who will seek attorney's fees is small, Congress could have rationally assumed that the cost of vindicating these rights could have been adequately borne by public interest organizations, public advocacy organizations, many of whom are publicly funded. And so what Congress has done here by excluding these adult aged children is actually put them in a neutral position. Yes, it may be true that they are unable to recover attorney's fees when they are prevailing party, but if I could redirect the panel's attention to the third category of an award of attorney's fees, which is to a prevailing state educational agency or local educational agency, which actually provides for an award against a parent when the complaint that was asserted is frivolous or intended to harass. So while an adult aged child may not be able to recruit attorney's fees, he or she will certainly not face any liability as well. So in that sense, with respect to attorney's fees, they are certainly in a neutral position. Thank you, Mr. Kruger. Thank you. I only have one point to make, and that is the purpose of the fee provision, as it is in the IDEA and any other civil rights statute, is twofold. The first is to level the playing field, but also to deter bad behavior and noncompliance by the state authorities. And in this case, J.S. was deprived of an education for three years, and he was in a situation in prison when he could have benefited from getting an education, and yet he got away with it. He got nothing. And then no objection from DOCS, and then finally we get to attorney's fees, and there's an objection all of a sudden. And if we were to deny him those attorney fees, then he, that DOCS has really suffered no harm, no punitive. So how would you characterize the state's posture on the merits? It just surrendered, did it? No. There was a two-day hearing, Your Honor, and it was involved. In fact, it was the first administrative due process hearing that was ever brought against DOCS, so it was a new experience for everyone. But nevertheless, J.S. had the courage to do it, and he should have had the right to do it, and he should receive attorney fees because he prevailed. Thank you very much. We'll reserve the decision, and we're adjourned. Court is adjourned. Thank you.